UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

UNITED STATES OF AMERICA )
)
)
v. ) NO.: 2:12-CR-106
)
DALE EDWARD STANLEY )

MEMORANDUM OPINION AND ORDER

The defendant, Dale Edward Stanley ("Stanley"), was indicted by a federal grand jury sitting in the Eastern District of Tennessee on November 14, 2012, and charged with twenty-two counts of wire fraud in violation of 18 U.S.C. § 1343. A second superseding twenty-two count indictment was returned on March 12, 2013. The superseding indictment corrected some offense dates but otherwise did not change the substantive charges. On April 8, 2013, Stanley pled guilty to Count Nineteen of the indictment pursuant to a negotiated plea agreement. As part of the negotiated plea agreement, Stanley submitted a stipulation of facts to establish the factual basis for his plea of guilty:

> Dale Edward Stanley, a resident of Clintwood, Virginia, incorporated Mountain Energy Resources, Inc. (hereinafter "Mountain Energy") in 2004 under the laws of the Commonwealth of Virginia. Mountain Energy's principal place of business was in Norton, Virginia, and Mountain Energy was wholly owned by Stanley. Mountain Energy engaged in the business of selling coal. Mountain Energy purchased coal from coal operations throughout the coal fields in Virginia and Kentucky, and the coal was transported by truck to Mountain Energy's tipple facility in Norton, Virginia. Mountain Energy routinely obtained analyses of coal it purchased so as to know the qualities of the coal for eventual sale to Mountain Energy's customers. After Mountain Energy arranged the sale

1

of the coal, the coal was loaded onto railroad cars and trucks for delivery to the purchasers.

Eastman Chemical Company (hereinafter "Eastman") was a corporation organized under the laws of the State of Delaware with a principal place of business in Kingsport, Tennessee, and was engaged in the manufacture and sale of chemicals, fibers, and plastics.

In its operations, Eastman used large quantities of steam coal (a grade of coal between bituminous and anthracite) and purchased the coal from multiple vendors, to include Mountain Energy, with most of the coal shipped to Eastman by train.

Eastman required that coal purchased for certain operations have a BTU (British Thermal Unit) rate of approximately 12,500 BTUs or higher and an ash rate of approximately 10% or lower. Eastman's purchase orders set forth an agreed upon price per ton for coal that met the required specifications. Eastman also paid a "BTU premium" if the coal received had an analysis which exceeded the 12,500 BTU minimum requirement set forth in the purchase orders.

While much of the coal Eastman purchased was bought from larger suppliers, Eastman also purchased coal from smaller suppliers such as Mountain Energy on the spot market.

Eastman had purchased coal through a coal broker, Black Gold, LLC, of Abingdon, Virginia, from 2007 through 2009. The coal provided to Eastman through Black Gold was supplied and loaded by Mountain Energy. Black Gold ended its business relationship with Mountain Energy in 2009.

Stanley, on behalf of Mountain Energy, contacted Eastman in late 2009 seeking to sale coal directly to Eastman. Eastman issued its first purchase order to Mountain Energy in January 2010, and Mountain Energy made the first shipment of coal to Eastman in February 2010. The purchase orders Eastman issued to Mountain Energy set forth the minimum acceptable BTU rate and maximum acceptable ash rate for the coal to be provided by Mountain Energy, along with the quantity of coal to be purchased, the price per ton, and the formula for calculating the BTU premium or penalty for coal with a BTU rate above or below the specified rate.

2

Eastman contracted with a third party inspection and testing company, SGS North America, Inc. (hereinafter SGS), to sample and test coal which Eastman was purchasing, the samples to be taken where Mountain Energy was loading the train cars with coal to be shipped to Eastman. The testing was to determine whether the coal being provided by Mountain Energy met Eastman's requirements, particularly as to BTU rate and ash rate, and was also used in determining how much Eastman would pay Mountain Energy for the coal. The samples were to be "flow samples," that is, samples of the coal as it was being loaded into the rail cars, to insure that the samples collected and tested accurately represented the coal being loaded and sold to Eastman.

From February 2010 to February 2012, Mountain Energy delivered to Eastman approximately 67,594 tons of coal.

From on or about February 1, 2010 to on or about February 29, 2012, Stanley devised and intended to devise a scheme to defraud Eastman on the coal sales. Stanley directed Mountain Energy to fill railroad cars for shipments to Eastman with coal which had a lower BTU rate and higher ash rate than specified in Eastman's purchase orders, to include both directing employees to mix lower quality coal with coal which met the specifications and also by placing lower quality coal in rail cars underneath higher quality coal which met the specifications.

To circumvent the testing scheme, Stanley had the SGS employees, who were supposed to be obtaining flow samples, obtain coal from a pile of higher quality coal which Stanley kept on hand and submit that coal for testing as the coal which had been loaded on the rail cars for Eastman. Stanley gave cash to one SGS employee, approximately $300 per rail shipment, for that person's involvement in the scheme. SGS tested the higher quality coal and provided those reports to Eastman and to Mountain Energy, reports that reflected the ash rate for the coal being delivered to Eastman was 10% or lower and that the BTU rate was 12,500 BTUs or higher. In addition to the contracted price per ton for the coal, Eastman paid Mountain Energy additional "BTU premiums" based upon the reports.

Stanley caused to be sent by interstate wire communications, that is, facsimile telecopier and electronic mail, false and fraudulent invoices for payment to Eastman for coal provided under the purchase orders, the coal being of a lower quality than represented and Mountain Energy

3

fraudulently receiving payment of premiums for higher BTU rate coal. The invoices were sent from Mountain Energy's office in Norton, Virginia, to Eastman's offices in Kingsport, Tennessee.

On December 27-29, 2011, Stanley directed the loading of a thirty-car shipment of coal to Eastman, each rail car holding approximately 100 tons of coal. Stanley directed that coal known to have a higher ash rate and lower BTU rate than the purchase order specifications be loaded. The SGS employee, instead of properly collecting a flow sample, submitted the sample provided to him as directed by Stanley. The shipment was sent to Eastman on December 29, 2011. The coal sample submitted to the SGS laboratory for testing reflected an ash rate of 5.47% and a BTU rate of 13,154 BTUs. Subsequent testing by another testing service of the coal actually delivered to Eastman showed that coal had, on average, an ash rate of approximately 16.57% and a BTU rate of approximately 10,865 BTUs.

On January 23, 2012, a secretary for Mountain Energy, under the direction of Stanley, sent by e-mail from Norton, Virginia to an Eastman employee in Kingsport, Tennessee an invoice for the shipment of coal sent to Eastman on December 29, 2011. In addition to seeking payment of $253,971.70 for the approximately 3,060 tons of coal shipped, Mountain Energy also sought payment of a BTU premium in the amount of $13,287.79, the premium having been calculated on the fraudulently manipulated SGS analysis.

[Doc. 48, ¶ 4].

A presentence investigation report ("PSR") was ordered and sentencing scheduled for October 21, 2013.[1] Based on a total offense level of 18 and a criminal history category of I, the probation officer calculated Stanley's advisory guidelines range at 27-33 months of imprisonment. No objection was made by either the government or the defendant as to the applicable guidelines range. A government motion for downward departure pursuant to USSG § 5K1.1 was granted, the Court departed downward by one level, and defendant's advisory

---

[1] The hearing was continued twice on the motion of defendant.

4

Case 2:12-cr-00106-JRG   Document 85   Filed 07/02/14   Page 4 of 18   PageID #: 533

guidelines range was determined to be 24-30 months. Over the course of three days (February 26, 2014, April 22, 2014 and June 11, 2014), the Court heard the testimony of 14 witnesses, including defendant, on issues related to the 18 U.S.C. § 3553(a) factors and restitution and the matters have been fully briefed by the parties. Stanley was sentenced on June 11, 2014 to a term of one year and one day of imprisonment, a $10,000 fine and a three-year term of supervised release. The Court took the issue of restitution under advisement and this order will resolve that issue.

The parties hold widely divergent views on the restitution owed in this case. The government argued initially that restitution in the amount of $933,009.86 is owed by defendant to the victim, Eastman Chemical Company ("Eastman"), but has now revised its request to $671,677.08. (*See* Ex. 2A). The defendant, on the other hand, argues that if he owes any restitution, it is less than $100,000. Restitution is mandatory in this case pursuant to 18 U.S.C. § 3663A(a)(1).

The Mandatory Victims Restitution Act of 1996, 18 U.S.C. § 3663A, provides that a sentencing court "shall order" restitution, "in addition to . . . any other penalty authorized by law," to a victim "directly and proximately harmed as a result of the commission" of an "offense against property . . . including any offense committed by fraud or deceit." 18 U.S.C. § 3663A(a)(1), (a)(2) and (c)(1)(A)(ii). The Court "shall order restitution in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant." 18 U.S.C. § 3664(f)(1)(A). The Court resolves disputes as to the proper amount of restitution by the preponderance of the evidence and the burden of proving the loss sustained by the victim is on the government. 18 U.S.C. § 3664(e).

5

A defendant convicted of a fraud offense involving a scheme element, such as wire fraud, is liable for restitution for losses arising out of the entire scheme, not just restitution for losses that can be tied to a particular count of conviction. *United States v. Davis*, 170 F.3d 617, 627 (6th Cir. 1999). While economic circumstances of the defendant may not be considered by the court in determining the amount of restitution, the court should consider the defendant's financial resources and assets, projected future cash flow, and financial obligations in setting a payment schedule for the restitution. 18 U.S.C. § 3664(f)(2).[2]

As to the amount of restitution ordered, restitution is designed to make a victim whole-no more, no less. *United States v. Lively*, 20 F.3d 193, 201-02 (6th Cir. 1994). The Court "must base its order of restitution on actual losses." *United States v. Redell*, 328 Fed. App'x 328 at *1 (6th Cir. 2009) (citing *United States v. Simpson*, 538 F.3d 459, 465-66 (6th Cir. 2008) and *United States v. Finkley*, 324 F.3d 401, 404 (6th Cir. 2003)). In calculating the amount of loss for restitution purposes, the district court "need only make a reasonable estimate of the loss," *United States v. Jones*, 511 Fed. App'x 420, 423 (6th Cir. 2013) (citing USSG § 2B1.1 cmt. n. 3(C)), especially in cases "where the loss is occasioned by financial frauds and is not easy to quantify." *United States v. Triana*, 468 F.3d 308, 320 (6th Cir. 2006). Precision is not required. *Id*. (citation omitted).

As noted above, the Court is presented here with two very different methodologies for calculating the amount of restitution. First, the government's. Stanley provided 21 shipments of coal to Eastman between February 2010 and February 2012, the first 19 of which are primarily at

---

[2] The Court has already addressed the payment schedule, providing in the Court's judgment, [Doc. 84], that defendant shall pay any unpaid restitution at the commencement of the term of supervised release on a monthly basis at the rate of ten percent of his gross monthly income.

6

issue here.[3] The total cost of these first 19 shipments to Eastman was $5,666,003.76 (including cost of train, freight, and BTU premiums). Only one of the first 20 shipments was independently tested, i.e., the twentieth shipment in late December 2011, and its contents were substantially outside the contract specifications. While the government concedes that the exact quality of the earlier shipments is not known, the government argues that it is appropriate and reasonable to apply the results of the one tested shipment to all prior shipments, because Mountain Energy employees confirmed that non-conforming coal was added to every shipment.

Eastman purchased coal from Stanley on the "spot market," a term used to describe sporadic sales of coal without a standing contract. Sellers on the spot market typically were paid lower prices than other sellers. Eastman issued purchase orders to Mountain Energy which specified coal with 12,500 BTUs as received and an ash rate of ten percent or lower. On December 29, 2011, Stanley shipped approximately 3,060 tons of coal to Eastman (30 train cars with approximately 100 tons per car). The manipulated SGS samples reflected an ash rate of 5.47% and 13,154 BTU. Eastman had been alerted by an anonymous[4] letter that Stanley was manipulating the test samples and provided with numbers of three rail cars which were allegedly loaded with inferior quality coal, ns 32569, ns 28427 and ns 25541.

As a result of the letter, Eastman, upon receipt of the December 29 shipment, engaged an independent testing laboratory to sample and test five of the 30 cars in the shipment, including the three identified in the anonymous letter. The results of the samples taken on January 17, 2012 reflected an average ash rate for the cars of 16.57% and average BTU of 10865.[5] Eastman

---

[3] The Court will deal with the twentieth and twenty-first shipments separately below. Eastman did not pay Stanley for either of these shipments.

[4] It is now known that the letter was actually authored by Douglas Kilgore, who has been involved in a contentious relationship and litigation with Stanley, and who was referred to by FBI Special Agent Drew Scown during testimony at the sentencing hearing as someone with a "storied past."

[5] Samples were taken from the top, middle and bottom of each car. The highest ash rate for any sample was 19.47%, taken from the bottom of car number 39738 and the highest BTU was 11,385 taken from the bottom of car number

7

was invoiced by Stanley for $253,971.70, plus a BTU premium of $13,287.79, for this shipment. Eastman contacted the FBI and then, acting pursuant to FBI instructions, arranged for the shipment of another 30 car train of 3,000 tons of coal from Stanley. That shipment, delivered in February 2012, was likewise tested by Eastman. Based on samples taken from two cars, the average ash rate was 8.2% and the BTU was 12,088, below the purchase order specifications but nevertheless acceptable to Eastman.

Using the formula set out in Exhibit 1, page 17 and illustrated in Exhibits 2 and 2A, the government assumes that the coal shipped on each of loads 1 through 19 had a BTU of 10,890, resulting in a total restitution for those 19 loads of $887,948.74. The government also seeks restitution for the freight charges on the December 2011 shipment of $32,526.74 for a total restitution sought of $920,475.48. The government acknowledges that Stanley was never paid for the February 2012 shipment and the restitution should be offset by the amount due on that shipment, $248,798.40, resulting in total requested restitution of $671,677.08.

Stanley takes great issue with the government's methodology, arguing that all of the coal shipped by him met the minimum BTU specification of 12,500, and that he manipulated the SGS samples only in order to obtain the premium paid for coal with a BTU higher than 12,500. Stanley proposes a different methodology. In sum, he argues that restitution should be ordered only as to the BTU premiums overpaid and, given the offset to which he is entitled, he owes no restitution. Stanley argues that the government's calculation is unreasonable and "wholly inconsistent with credible documentation," arguing that two "assumptions" made by the

---

28427. The lowest ash rate was 14.15% from the bottom of car number 28247 and the lowest BTU was 10,312 from the middle of car number 39738.

government are flawed-i.e., (1) that all 19 shipments of coal were manipulated, and (2) that all 19 shipments had a BTU of 10,900 at the time it was loaded[6] at Mountain Energy.

Stanley posits a host of reasons why the government's "assumptions" are not valid: (1) the correct figure to use for the December 2011 shipment is 12,021 BTU, not 10,900; (2) the government's "theory" that Stanley's scheme was based in part on "layer loading" is not supported by the evidence; (3) the evidence does not support a finding that every SGS analysis was manipulated, but Stanley will accept that for purposes of calculating restitution; (4) Mountain Energy had no "complaints" from other customers who purchased substantially the same coal as Eastman from Mountain Energy; (5) e-mails show that Eastman analyzed the coal shipments during 2010 and found them acceptable; (6) the December 2011 sampling was done by SGS employee, Anthony Wells, not Gary Clonce, to whom Stanley had paid bribes; (7) Mountain Energy records established that it never purchased 10,900 BTU coal on a regular basis or in sufficient quantities to supply 67,500 tons to Eastman; and (8) Mountain Energy made no profit from the coal sales to Eastman.

In short, it seems to the Court that two general issues must be decided in this matter. First, the Court must determine what, if any, actual loss the government has proven that Eastman suffered with respect to the first 19 shipments of coal. Critical to this issue is resolution of whether the 10,890 BTU figure established by Eastman's independent testing lab as to the twentieth shipment is valid and can be used as a reasonable approximation of the BTU value of each of the first 19 shipments. Second, the Court must decide what, if any, offset Stanley is entitled to for the December 2010 and February 2012 shipments.

---

[6] Stanley argues, and several government witnesses agreed, that the standard in the coal industry is that BTUs are measured at the point of origin, i.e., Stanley's tipple facility, and that the buyer assumes the risk of decrease in BTUs during shipment because of moisture or other conditions. Eastman's purchase specifications, however, clearly specify a 12,500 BTU minimum **as received**. (See Ex. 41).

9

Stanley first argues that the correct figure to be used for the December 2011 shipment of coal is not 10,900 BTU but rather is 12,021 BTU. It is undisputed that moisture content of coal affects the BTU of that coal on an inverse basis, i.e., the lower the moisture content, the higher the BTU and vice versa. According to Stanley, it is generally accepted in the coal mining industry that any moisture content of coal above five percent comes from the coal being exposed to the forces of nature, i.e., rain or snow, and that, for each one percent of moisture content above five percent, the BTU is reduced by 200-250 BTU. This, Stanley argues, is exactly what happened with the December 2011 coal shipment. As received by Eastman, the December 2011 shipment of coal had a moisture content of approximately ten percent. By factoring out the rain/snow that occurred between shipment of the coal from Stanley's tipple facility and its receipt by Eastman, known as "MFBTU" or "dry basis," the average BTU based on the actual Mineral Lab results, is 12,021.

There are several problems with Stanley's calculation. First, although Stanley contends that the industry standard in the coal mining industry places the burden of loss in BTU between the point of sale and the point of receipt on the buyer[7], in this case Eastman, the industry standard was superseded by Eastman's written purchase specifications which required a BTU of 12,500 minimum "As Rec'd." In other words, Eastman's purchase specifications required 12,500 minimum BTU at the point of receipt, not at Stanley's tipple facility where the coal was loaded on the train.[8] (See Purchase Specifications No. P-17-253-325, Ex. 41). As the government's witness testified, coal with an as received BTU of less than 12,500 does not meet

---

[7] Stanley's Supplemental Sentencing Memorandum, [Doc. 73 at 7], misstates his position ("the seller bears the burden of loss"). It is clear, however, from the context and from the hearing itself that Stanley contends that industry standard places the risk of loss on the buyer.
[8] This conclusion is not altered by the fact that Eastman chose to do sampling through SGS at the point of origin, i.e., Stanley's tipple facility. Eastman could have independently sampled any of the coal received from Mountain Energy at its point of delivery if it had chosen to do so. That Eastman may have chosen to accept the SGS point of origin testing does not change the requirements of the purchase specifications.

10

the Eastman specifications and purchase order requirements, and comparison of dry-basis BTU with as-received BTU is not valid—"a comparison of apples to an orange." (*See* testimony of William Bennett McNally; Ex. 30). Second, other than the SGS testing results, which were manipulated by Stanley, Stanley offers no proof that the moisture content of the December 2011 load was not ten percent or thereabouts at the time the shipment left his facility. And, finally, Stanley has offered no proof of significant rain or snow between the time the December 2011 shipment was loaded at his tipple facility and its receipt by Eastman. On the contrary, the government offered reports from the National Climatic Data Center for weather data from Tri-Cities Regional Airport during the relevant time period which showed little precipitation in the area.

That brings the Court squarely to the question of whether the government's use of the December shipment's confirmed as-received BTU is a reasonable estimate of the as-received BTU of the prior 19 shipments or, if not, what, if any, BTU estimate is appropriate. As an initial matter, the Court must deal with Stanley's contention, through his testimony at the sentencing hearing, that he always shipped 12,500 minimum BTU coal to Eastman and that he manipulated some, but not all, of the samples taken by SGS in order to obtain the BTU premium paid by Eastman. The key to the resolution of that question comes from Stanley's own words. First, the factual stipulation in Stanley's plea agreement sheds considerable light on the matter. Stanley stipulated that the SGS sampling and testing of coal which was purchased by Eastman "was to determine whether the coal provided by Mountain Energy met Eastman's requirements, **particularly as to BTU rate** and ash rate, and was also used in determining how much Eastman would pay Mountain Energy for the coal." (PSR, ¶ 16) (Emphasis added). He also stipulated

11

that he "directed Mountain Energy to fill railroad cars for shipment to Eastman which had a lower BTU rate . . . than specified in Eastman's purchase orders . . . *Id*.

"From on or about February 1, 2010 to on or about February 29, 2012, Stanley devised and intended to devise a scheme to defraud Eastman on the coal sales. To ***circumvent the testing scheme***, Stanley had the SGS employees, who were supposed to be collecting flow samples, obtain coal from a pile of ***higher quality coal*** which Stanley kept on hand and submit that coal for testing as the coal which had been loaded on the cars for Eastman. . . . SGS . . . provided those reports to Eastman . . . that reflected the ash rate for the coal being delivered to Eastman was ten percent or higher and that the BTU rate was ***12, 500 BTUs or higher***." (PSR, ¶ 17) (emphasis added).

Also telling is Stanley's "acceptance of responsibility statement" submitted to the probation officer. When discussing the shipments of coal to Eastman, Stanley acknowledges that he "made sure that the samples being sent to Eastman were taken from coal piles that would produce ***BTU of at least 12, 500 and higher***." The coal that was actually shipped to Eastman would have been coal that was ***either compliance or slightly lower***."

It seems quite clear to the Court from these admissions that Stanley manipulated the sampling of coal by SGS employees both for the purpose of assuring compliance with the minimum BTU specifications of Eastman and also to guarantee payment of the BTU premiums. Furthermore, the evidence clearly preponderates in favor of a finding that Stanley manipulated all samples during the relevant timeframe and that Eastman is due restitution for all 19 of the coal shipments before late December 2011. There is no current dispute over the proposition that Stanley illegally collected BTU premiums from Eastman on all 19 loads of coal. The real issue is the amount he also illegally collected for delivery of coal with BTU of less than the 12,500

12

specified in the Eastman purchase specifications and the purchase order. In short, the Court must decide what BTU penalty would have been extracted by Eastman from Stanley as the result of the shipment of below compliance coal.

The government, of course, asks the Court to figure this category of loss by "assuming" that each load of coal was the same inferior quality as the December 2011 shipment. As noted above, Stanley argues that such an approach is flawed for the reasons outlined above. The Court has discussed the first and third objections above. The second objection made by Stanley appears to be irrelevant to the inquiry.[9] In addition, even assuming the truth of these other assertions, the lack of complaints from other Mountain Energy customers, Eastman's acceptance and use of non-conforming coal shipped prior to December 2011, and the lack of profitability of Mountain Energy operations shed little light on the situation. Records produced by Stanley related to his purchases of coal directly from the mines in 2010 and 2011 do, however, bear some discussion. Succinctly put, Stanley argues that the business's raw data related to its procurement of coal establishes that Mountain Energy never purchased sufficient quantities of 10,900 BTU coal to have supplied 67,500 tons of such non-compliance coal to Eastman. William McNally, the government's expert witness, agreed with defense counsel that one reasonable way of determining the quality of coal shipped to Eastman would be by comparison with reliable data showing the quality of coal available to Mountain Energy for shipment to Eastman during the relevant period.

Stanley and an employee prepared and submitted to the Court voluminous records and summary spreadsheets for coal purchases by Mountain Energy in 2010 and 2011, the amount paid by Mountain Energy for the coal, the BTU of the coal based on price paid, all using

---

[9] The second objection has to do with layer loading which Stanley has adamantly denied. Again, however, Stanley stipulated that he directed employees to "plac[e] lower quality coal in railcars underneath higher quality coal which met the specifications."

13

available lab analysis.[10] For example, employee Amber Mullins prepared a spreadsheet on which she listed all coal purchases by Mountain Energy for 2010-2011, *see* Ex. 49[11], and which listed the BTU for each purchase. In a very few instances, the BTU listed is a very specific number. These numbers, according to Mullins, came from a laboratory analysis. The vast majority of the BTU numbers, however, were given to her by Stanley and based on the price paid for the coal and his knowledge of the particular coal purchased. That exhibit consistently shows coal purchased by Mountain Energy with BTU at or above 12,500 during the period of sales by Mountain Energy to Eastman.

These Mountain Energy records, however, are highly suspect. For one thing, Stanley's own credibility is suspect. The Court cannot lose sight of the fact that Stanley has been convicted in this very case of a fraud offense, one involving bribery and a high level of dishonesty. Second, as the government pointed out during cross examination of Mullins, Exhibit 49 appears to be incomplete despite Mullins's testimony that all information on the spreadsheet came directly from an Excel spreadsheet maintained by the business. For instance, Exhibits 78 and 79 are SGS analysis reports prepared for Mountain Energy on purchases of coal from PIA Strip and supplied on February 16 and 18, 2011. The analysis shows the coal sampled on February 16, 2011 with an as received BTU of 11,326 and on February 18, 2011 with BTU of 12,096. Exhibit 49 shows purchases of coal from PIA Strip on February 16, 17 and 18, 2011 but lists a BTU, apparently based on Stanley's estimation, of 12, 500. (*See* also Exhibit 76 at 8). Likewise, Exhibits 49 and 76 list purchases of coal from Vance Enterprises on March 7, 8 and 9,

---

[10] In most, if not all, cases, the available laboratory analysis came from SGS. The Court, however, will not rely on any SGS analysis of samples during the relevant time period because the samples were manipulated by Stanley and SGS employees. Whether the analyses have the "appearance of being accurate," as Stanley argues, or not, the Court considers them unreliable. Indeed, it seems somewhat ironic that Stanley admits to manipulating the sampling process and yet asks the Court to rely on SGS test results for any purpose.

[11] Exhibit 49 shows sales of coal for the same period of time but does not show BTU for coal going out from Stanley's facility.

14

2011 with a BTU of 12,500. The SGS analysis report for March 9, 2011 samples taken from supplier Vance show a BTU as-received of 11,831. Exhibits 81, 82, 83 and 84 are SGS reports for coal purchased from H & D and DD&G sampled on June 29, 2011, July 12, 2011, July 14, 2011 and July 18, 2011 with as-received BTUs of 11,835 (H&D), 10,363 (DD&G), 9,780 (DD&G) and 9,605 (DD&G). These purchases do not appear to be listed on Exhibits 49 and 76 or, if they are, they are reported with highly inflated BTUs. These business records produced by Stanley simply do not establish that each of the 19 loads of coal complied with Eastman's minimum BTU specification.

That leaves the Court with the difficult task of deciding what restitution above the BTU premium paid is due for failure to comply with Eastman's minimum BTU specifications on the first 19 loads of coal. Stanley argues that the government has not met its burden of proof as to the amount of these losses and, presumably as a result, the Court should not order restitution above the amount of the BTU premiums paid. Stanley alternatively argues that the Court adopt a figure based on 12,000 BTUs, the average for the coal tested in the twenty-first shipment. Because Stanley manipulated the samples, the Court has no reliable test results upon which to base its determination, requiring the Court to make a reasonable approximation of the loss.

Neither the government's approach of using the as-received BTU calculation for the December 2011 shipment nor Stanley's alternate approach of using the as-received BTU from the February 2012 shipment are particularly persuasive. In one sense, one makes as much sense as the other; yet, the government does not argue that there was any manipulation of the February 2012 samples. The Court will instead use the average of the two, 11,500 BTUs, in calculating the restitution. The government shall, therefore, recalculate the loss on the first 19 shipments using the number 11,500 BTUs instead of 10,890 to calculate the BTU penalty and submit the

15

calculation to the Court within five business days of this order. The Court will then enter a final order on the total restitution amount.

Finally, the Court must deal with the December 2011 and February 2012 shipments (the twentieth and twenty-first shipments) and Stanley's claim for an offset against the restitution obligation for the amount owed by Eastman for those shipments. The government has conceded that Stanley is due an offset for TNC-87, the February shipment, which was accepted and consumed by Eastman, in the amount of $248,798.40. The more difficult question relates to the December 2011 shipment. That shipment, TNC-36, consisted of 30 rail cars containing slightly more than 3,000 tons of coal, with a total cost of $267,251.67 before freight charges were added.

As noted elsewhere in this memorandum, this shipment left Stanley's tipple facility on December 29, 2011, and was the subject of the anonymous letter (now known to have been sent by Douglas Kilgore; Ex. 30), received by Eastman which led to the independent sampling of the shipment. The Kilgore letter specifically alleged that 80 tons of 8,000 to 12,000 BTU coal were loaded in the bottom of the cars and identified three of the suspect cars, ns32569, ns28427 and ns 25541. As a result, Eastman obtained independent sampling and testing of those three cars[12] and two others on the train, leading Eastman to reject the entire shipment, consistent with Eastman's terms of delivery specified on its purchase order. The government contends, and William McNally confirmed, that the December 2011 shipment had no value as it was not suitable for its intended use as a fuel by Eastman. Indeed, the government seeks restitution for the freight costs associated with TNC-36 in the amount of $32,526.74. The coal was ultimately used by Eastman as a base/gravel at its facility.

---

[12] Exhibit 3 lists the numbers of the cars sampled and the test results with the average BTU of 10,865. The list includes car number 32596. It is apparently undisputed that car number 32596 is the same car identified in the Kilgore letter as ns32569.

16

Stanley contends that he offered to pick up the rejected coal by truck from Eastman and to pay the necessary freight costs, but Eastman refused.[13] The government offered no explanation about why Eastman was unwilling to return the coal to Stanley, especially in light of the language on its purchase order which indicates that, upon notification of rejection of the shipment by Eastman, "seller shall promptly remove the coal at its expense and shall reimburse Eastman for transportation, demurrage, and handling expenses incurred by Eastman." (Ex. 38). While the coal on TNC-36 appears to have had no value to Eastman as fuel, Stanley claims it did have value and could have been sold to other customers, if only he had been allowed to remove the coal. In short, Stanley argues that although Eastman may have had the right to reject the December, 2011 shipment, Eastman breached the terms of its purchase order by refusing to allow Stanley to take possession of the coal.

This Court simply does not have sufficient evidence related to the December 2011 shipment to make the necessary findings by a preponderance of the evidence to resolve these issues. In other words, neither the government nor Stanley have offered proof from which the Court can determine whether Eastman breached a duty by not allowing Stanley to take possession of the coal and, if so, Stanley's entitlement to an offset or the amount of the offset. For the purposes of the restitution to be ordered in this case, the government has not carried its burden of proving that Eastman is entitled to restitution with respect to the December 2011 shipment and Stanley has not proven by the required quantum of proof that he is entitled to an offset related to this shipment or, if so, the amount of that offset. The parties disclosed to the

---

[13] Stanley also claims that he was "set up" with respect to the December 2011 shipment by Douglas Kilgore and an associate of Kilgore's who was employed by Stanley at the time. If the Court understands the claim correctly, most of the cars in the December shipment were loaded by an employee, Harold Mullins, who was loyal to Kilgore. Stanley believes Mullins loaded several target cars marked by golf balls with inferior coal and then identified the specific cars by number in the anonymous letter to Eastman. There is no support for such a claim and the fact that Eastman found inferior coal in at least two other cars seriously undermines this claim in any event.

Court during these proceedings that there is also civil litigation between Eastman and Stanley related to these coal shipments. That is the best forum for the resolution of these issues related to the December 2011 shipment to be resolved, after the parties have had opportunity for the discovery which is available in civil proceedings.

So ordered.

ENTER:

s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE
